Andrew M. Calamari
Sanjay Wadhwa
Charles D. Riely
Valerie A. Szczepanik
Alexander M. Vasilescu
William T. Conway III
Philip Moustakis
Jason W. Sunshine
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0542 (Moustakis)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                                        **Plaintiff,**

                    -- against --

**CHRISTOPHER PLAFORD,**

                                        **Defendant.**

---

**16 Civ. ___ (  )**
**ECF CASE**

**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Christopher Plaford ("Plaford" or "Defendant"), alleges as follows:

<u>**SUMMARY**</u>

1.      This case involves fraudulent schemes by Plaford, a former portfolio manager to affiliated private funds that invested in credit securities (collectively, "Credit Fund"), to inflate falsely the value of securities held by the Credit Fund, and, separately, to make trades based on material nonpublic information on behalf of the Credit Fund and certain other affiliated private funds that invested in healthcare securities (such other funds, collectively, "Balanced Fund").

2.      From at least July 2011 to January 2013 ( "Relevant Period"), Plaford, together with Stefan Lumiere ("Lumiere"), another portfolio manager to the Credit Fund, routinely manipulated the valuation procedures of the advisory firm that advised the Credit Fund ("Investment Adviser") by using sham broker quotes to mismark – *i.e.*, misprice or overvalue – securities held by the Credit Fund.

3.      To make the sham broker quotes appear to be real quotes from outside brokers, Plaford and Lumiere told certain "friendly" outside brokers the specific prices they wanted for securities held by the Credit Fund and directed the outside brokers to send – or "U-turn" – the same prices back to them.

4.      After obtaining the sham, U-turned quotes from the friendly brokers, Plaford or Lumiere submitted them to Investment Adviser's back office (*i.e.*, its accounting and/or operations staff) to provide to the Credit Fund's independent administrator as a basis for overriding valuations from established pricing sources which, pursuant to Investment Adviser's disclosed valuation methodology, the independent administrator otherwise would have used to value the securities held by the Credit Fund.

5.      In furtherance of the mismarking scheme, Plaford also purchased one particular security at an above-market price in order to inflate the apparent value of the security and the apparent value of the Credit Fund's position in the security.

6.      The mismarking scheme ran contrary to the valuation methodology Investment Adviser disclosed to investors and potential investors, which required the pricing of Credit Fund assets to be carried out by Investment Adviser's accounting team, independent of its portfolio managers and trading desk, and to rely on established pricing sources, such as Reuters and Bloomberg.

7.     The Credit Fund and its investors were never told that Investment Adviser used sham quotes to value securities held by the Credit Fund, or that Investment Adviser's disclosed valuation procedures were being manipulated to inflate the month-end values of Credit Fund assets, as well as its reported net asset value ("NAV") and performance.

8.     As a result of the mismarking scheme, during the Relevant Period, Plaford knowingly or recklessly defrauded the Credit Fund and its investors by causing:

(a)     Investment Adviser to inflate month-end valuations for securities held by the Credit Fund;

(b)     the Credit Fund to overstate its reported month-end NAVs;

(c)     the Credit Fund to overstate its reported month-end and annual performance;

(d)     the Credit Fund to misclassify certain distressed assets held by the Credit Fund, in monthly reports provided to Credit Fund investors by the fund's independent administrator, as "Level 2" assets, instead of "Level 3" assets, under the Financial Accounting Standards Board's framework for measuring "fair value," codified in Accounting Standards Codification Topic 820 ("ASC Topic 820"), thus falsely indicating to Credit Fund investors and potential investors that the valuation of the distressed assets at issue was based on observable market inputs – *i.e.*, higher quality inputs than would have been the case had the assets been classified as Level 3 assets – which

3

certain investors viewed as a measure of the liquidity of the

assets; and

(d)   the Credit Fund to pay management and performance fees to

Investment Adviser that it would not have paid but for the

falsely inflated valuations of Credit Fund assets.

9.   During the Relevant Period, the mismarking scheme caused:

(a)   Investment Adviser to overvalue individual mismarked

securities held by the Credit Fund, at each month's end, on

average, between approximately 5 percent and 35 percent;

(b)   the Credit Fund to overstate its reported month-end NAVs by

as much as 7 percent;

(c)   the Credit Fund to report a 0.68 percent annual gain for 2011

instead of an approximate 4 percent loss, and a 5.82 percent

annual gain for 2012 instead of an approximate 4 percent gain;

and

(d)   the Credit Fund to pay approximately $5.9 million in excess

management and performance fees to Investment Adviser.

10.   In addition to participating in the mismarking scheme, Plaford traded based on

material nonpublic information on behalf of both the Credit Fund and the Balanced Fund, which,

like the Credit Fund, was advised by Investment Adviser.

11.   On or between March 1, 2010 and July 23, 2010, Plaford profitably traded on

behalf of the Credit Fund based on material nonpublic information he received concerning an

impending approval by the United States Food and Drug Administration's ("FDA") Office of

4

Generic Drugs ("OGD") to permit the sale of a drug called enoxaparin, which is a generic version of the brand-name drug Lovenox.

12.     Plaford received the material nonpublic information from Sanjay Valvani ("Valvani"), a partner and portfolio manager at Investment Adviser.  At the time he received the material nonpublic information from Valvani, Plaford knew that (a) Valvani had obtained the material nonpublic information from Gordon Johnston ("Johnston"), a former OGD official who served as a paid consultant to Investment Adviser, and (b) Johnston himself had obtained the material nonpublic information from FDA employees.

13.     Following receipt of the material nonpublic information, Plaford caused the Credit Fund to purchase credit default swap contracts linked to Sanofi, S.A. ("Sanofi"), the company that manufactured Lovenox, betting that the revenues and creditworthiness of Sanofi would decline upon the FDA's approval of a generic drug that would compete directly with Sanofi's Lovenox.

14.     Three years later, on or between May 30, 2013 and June 27, 2013, Plaford profitably traded on behalf of the Credit Fund and the Balanced Fund based on material nonpublic information he received from another paid consultant concerning an impending announcement from the Centers for Medicare and Medicaid Services ("CMS") of a proposed cut to Medicare reimbursement rates for certain home health services.  The paid consultant was a former CMS employee who informed Plaford that his information concerning the impending announcement came from sources within CMS.

15.     Following receipt of this material nonpublic information, Plaford caused the Credit Fund and Balanced Fund to sell short the securities of two home health services providers.

16.     Investment Adviser's policies and procedures concerning material nonpublic information put the onus on its employees to alert Investment Adviser's Legal Department or chief compliance officer ("CCO") if an employee came into possession of material nonpublic information and to forgo trading on material nonpublic information, and had limited other protections.  Here, Plaford repeatedly failed to alert Investment Adviser's Legal Department or CCO that he had received material nonpublic information and, instead, he placed trades based on this information.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14].

18.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because Defendant may be found in, or is an inhabitant of, or transacts business in this district, and certain of the transactions, acts, practices, or courses of business constituting the violations alleged herein occurred in this district.

19.     Defendant, directly or indirectly, used means or instrumentalities of interstate commerce, of the mails, and/or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANT

20.     **Plaford**, age 38, resides in Bedford, New York.  During the Relevant Period, Plaford was a partner at Investment Adviser and portfolio manager for the Credit Fund, with

trading authority over the Credit Fund's portfolio.  Plaford also managed a portion or "sleeve" of assets in the Balanced Fund.  Under his employment agreement with Investment Adviser, Plaford was entitled to a percentage of the performance fees Investment Adviser received from the Credit Fund and for the assets Plaford managed in the Balanced Fund.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

21.     **Lumiere**, age 45, resides in New York City.  During the Relevant Period, Lumiere was employed by Investment Adviser as a portfolio manager with trading authority over a portion of the Credit Fund's portfolio.

22.     **Valvani**, age 44, resides in New York City.  Since approximately 2004, Valvani has been a partner at Investment Adviser and portfolio manager for the Balanced Fund.

23.     **Trader** was employed by Investment Adviser as a trader for the Credit Fund during the Relevant Period, and was subordinate to both Plaford and Lumiere.

24.     **Investment Adviser** is a Delaware limited partnership, with its principal place of business in New York City, and adviser to the Credit Fund and Balanced Fund.  Investment Adviser has been registered with the Commission as an investment adviser since April 2011.

25.     **Credit Fund** was comprised of an unregistered, Cayman Islands-based master fund, organized in a master-feeder structure, with a domestic unregistered feeder fund incorporated in Delaware, and an offshore unregistered feeder fund incorporated in the Cayman Islands.

26.     **Balanced Fund** was comprised of an unregistered Cayman Islands-based master fund, organized in a master-feeder structure, with a domestic unregistered feeder fund incorporated in Delaware, and an offshore unregistered feeder fund incorporated in the Cayman Islands.

27.     The unregistered funds that comprised the Credit Fund and Balanced Fund were "pooled investment vehicles," as defined by Rule 206-4(8) under the Advisers Act [17 C.F.R. § 275.206(4)-8(b)], because they met the definition of "investment company," as defined by Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3], but for the exclusion from the definition for issuers whose securities were not offered publicly and were owned exclusively by qualified purchasers.

28.     **Johnston**, age 64, resides in Olney, Maryland.  Between 2005 and 2010, Johnston, a former Deputy Director of OGD, contracted directly with Investment Adviser to provide consulting services.  From 2003 through 2011, Johnston served as Vice President of Regulatory Science for a trade association representing, among others, manufacturers and distributors of generic prescription drugs ("Generic Drug Trade Association").

## FACTS

*Background*

29.     In May 2009, Investment Adviser launched the Credit Fund for the primary purpose of investing in debt instruments issued by healthcare companies.

30.     As portfolio manager for the Credit Fund, Plaford was responsible for making investment decisions on the Credit Fund's behalf.

31.     During the Relevant Period, Lumiere was responsible for managing the distressed assets, or "special situations," portion of the Credit Fund's portfolio.

32.     Generally, the fixed income securities held by the Credit Fund, such as bonds and syndicated loans, traded in an over-the-counter market rather than on an exchange.  Typically, to buy or sell a security in an over-the-counter market, a fund would solicit prices, also called quotes, from a dealer who makes a market in the security the fund seeks to trade.  The dealer

would quote bid/ask prices to the fund to indicate where the dealer is willing to buy (the bid price) or sell (the ask price) the security.

33.     Over its life, the Credit Fund raised roughly $600 million in investor capital. During the Relevant Period, the Credit Fund raised approximately $113 million from new and existing investors.  In March 2012, the Credit Fund reported its peak net assets of $471.5 million.

34.     In April 2013, Investment Adviser closed the Credit Fund and began liquidating its assets.  To date, as a result of its inability to liquidate the Credit Fund's positions in certain distressed assets, Investment Adviser has been unable to fully redeem certain Credit Fund investors.

35.     Investment Adviser charged Credit Fund "Series A" investors a 1.5 percent management fee and 15 percent performance fee, and Credit Fund "Series B" investors a 2 percent management fee and 20 percent performance fee, calculated using the Credit Fund's NAV.

### *Investment Adviser's Disclosed Valuation Procedures*

36.     Investment Adviser's valuation methodology, as disclosed to investors in offering memoranda and limited partnership agreements for the Credit Fund, and elsewhere, sought to establish "fair value" for the Credit Fund's investments.

37.     During the Relevant Period, Investment Adviser's compliance manual, which was made available to Credit Fund investors and prospective investors performing due diligence on the fund, stated:  "[Investment Adviser] will apply valuation procedures for computing net asset value, or 'NAV', which are based upon GAAP [U.S. Generally Accepted Accounting Principles]" and "[a]ccording to GAAP, companies such as hedge funds are required to use 'fair value' in determining the value of an investment."

38.     The term "fair value" is defined by ASC Topic 820 as "the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an *exit price* at the measurement date from the perspective of a market participant that holds the asset or owns the liability)" (emphasis in original).

39.     In May 2010, Investment Adviser provided at least one Credit Fund investor with responses to a due diligence questionnaire that explained:  "In general, we value investments at 'Fair Value,' which is commonly the most recent transaction price or based upon the most recent bid-ask quotes."  Investment Adviser explained in the same questionnaire that the quotes it used to value securities would be "from market makers or broker dealers who transact in such securities."

40.     During the Relevant Period, Investment Adviser's compliance manual stated further that the "pricing function will be carried out by the accounting team which is independent of the portfolio managers and trading desk" and that "[Investment Adviser] will either calculate or verify the accuracy of prices independent of the trading function to the extent practicable."

41.     During the Relevant Period, Investment Adviser's compliance manual stated that valuations would be calculated by the Credit Fund's independent administrator and that "established pricing sources, including but not limited to Bloomberg and Reuters" would be relied upon for the pricing of assets.

42.     Consistent with Investment Adviser's disclosed valuation procedures, Investment Adviser's independent administrator utilized, and provided to Investment Adviser's back office, month-end prices from established pricing sources, such as Reuters and Mark-It (a loan pricing service), to value the Credit Fund's various fixed income securities holdings.

43.    During the Relevant Period, pursuant to its disclosed valuation procedures, Investment Adviser could disregard the independent administrator's price, and substitute its own month-end price, for a security held by the Credit Fund *only* when it felt that the "price used by the [a]dministrator was inconsistent with fair value" *and* Investment Adviser could "provide support for its pricing."

44.    During the Relevant Period, pursuant to Investment Adviser's disclosed valuation procedures, prices obtained from "dealers" could be used as pricing support, in which case it was "preferential to get at least three dealer marks."

45.    During the Relevant Period, the practice of disregarding the independent administrator's price, and substituting its own price, for a security held by the Credit Fund was known at Investment Adviser as a valuation or price "override."

46.    During the Relevant Period, Plaford knowingly or recklessly manipulated Investment Adviser's valuation process to override prices from established pricing sources that the Credit Fund's independent administrator otherwise would have used to price securities held by the Credit Fund with his own, hand-picked, sham quotes, which were U-turned through friendly brokers.

***Plaford Used Sham Broker Quotes to Manipulate Investment Adviser's Valuation Procedures.***

47.    Each month during the Relevant Period, Plaford and Lumiere used valuation overrides to mismark, *i.e.*, falsely overvalue, securities held by the Credit Fund.

48.    Each month during the Relevant Period, Plaford and Lumiere caused Investment Adviser to override prices from established pricing sources that, under Investment Adviser's disclosed valuation procedures, should have been used to value Credit Fund assets, with sham prices for certain securities held by the Credit Fund that did not reflect prevailing market values.

49.     Each month during the Relevant Period, Plaford and Lumiere procured sham quotes from one or more of three brokers friendly to them (each a New York-based broker that provided services to Investment Adviser).  Plaford and Lumiere then submitted the sham quotes to Investment Adviser's back office as a basis for overriding prices the Credit Fund's independent administrator otherwise would have used to value the securities.

50.     Each month during the Relevant Period, by manipulating Investment Adviser's monthly valuation process, Plaford, together with Lumiere, caused Investment Adviser to mismark anywhere from eight to twenty-eight securities held by the Credit Fund.

51.     During the Relevant Period, the sham broker quotes Plaford and Lumiere U-turned through the friendly brokers and submitted to Investment Adviser's back office were obtained to support fictitious valuation overrides and were not reflective of fair value as defined by ASC Topic 820.

52.     During the Relevant Period, Plaford knew or was reckless in not knowing the sham broker quotes he U-turned through friendly brokers and submitted to Investment Adviser's back office were obtained to support fictitious valuation overrides and were not reflective of fair value as defined by ASC Topic 820.

53.     During the Relevant Period, to make the sham broker quotes appear to be real quotes from outside brokers, Plaford and Lumiere told the friendly brokers the specific prices they wanted for the securities they intended to mismark with the direction to email the price quotes back to them, which the friendly brokers did.

54.     During the Relevant Period, Plaford and Lumiere provided the sham quotes obtained from the friendly brokers to Investment Adviser's back office as the support required,

under Investment Adviser's valuation procedures, to override the Credit Fund's independent administrator's prices for the same securities.

55.     During the Relevant Period, the independent administrator used the sham broker quotes, provided by Investment Adviser as support for its valuation overrides, to calculate the Credit Fund's month-end NAV, performance, and fees.

56.     Plaford knew or was reckless in not knowing the friendly brokers were not dealers in, and had little or no familiarity with, most of the securities the friendly brokers were asked to quote, and that the friendly brokers did little or no work to verify the accuracy of the prices they quoted to Plaford and Lumiere for securities held by the Credit Fund.

57.     During the Relevant Period, as a result of the mismarking scheme, the Credit Fund overvalued the mismarked securities.

58.     During the Relevant Period, Plaford and Lumiere overrode the independent administrator's valuation for securities held by the Credit Fund on at least 311 occasions.  Of the 311 overrides, 284 (or more than 91 percent), furthered the object of the mismarking scheme – meaning the overrides resulted in higher valuations for long positions or lower valuations for short positions held by the Credit Fund.

59.     During the Relevant Period, the Credit Fund's month-end valuations for the mismarked securities were inflated, on average, between approximately 5 and 35 percent.

60.     During the Relevant Period, Plaford knew or was reckless in not knowing the Credit Fund's month-end valuations for the mismarked securities were inflated and not consistent with prevailing market values.

61.     For example, during the Relevant Period, the Credit Fund:

(a)    relied on U-turned override quotes supplied by Plaford and Lumiere to overvalue – by anywhere from approximately 60 to 1,600 percent – a loan issued by ATI Enterprises, Inc. ("ATI" and "ATI Term Loan B"), a privately-held, for-profit school operator that defaulted on its loan obligations in June 2012.  The mismarked ATI Term Loan B position alone caused the Credit Fund to overstate its reported month-end NAV by around $11.5 million, or 3 percent, for July 2012;

(b)    relied on U-turned override quotes supplied by Plaford and Lumiere to overvalue – by anywhere from approximately 3 to 625 percent – a 4 percent coupon bond issued by China Medical Technologies, Inc. ("CMED" and "CMED 4% Bond"), a China-based medical device company that filed for bankruptcy in August 2012.  The mismarked CMED 4% Bond position alone caused the Credit Fund to overstate its reported month-end NAV by around $11 million, or 3 percent, for December 2012;

(c)    relied on U-turned override quotes supplied by Plaford and Lumiere to overvalue – by anywhere from approximately 3 to 22 percent – a bond issued by Oncure Holdings, Inc. ("Oncure"), a cancer treatment services company that filed for bankruptcy in June 2013.  The mismarked Oncure position alone caused the Credit Fund to overstate its reported month-end NAV by around $3.2 million, or 0.5 percent, in April 2012; and

(d)    relied on U-turned override quotes supplied by Plaford and Lumiere to overvalue – by anywhere from approximately 3 to 28 percent – a bond

issued by Nebraska Book Company, a college bookstore company that filed for bankruptcy in June 2011. The mismarked Nebraska Book Company position alone caused the Credit Fund to overstate its NAV by around $2.4 million, or 0.5 percent, for December 2011.

62.     During the Relevant Period, as a result of the mismarking scheme, the Credit Fund overstated its month-end NAV calculations, reported to investors and potential investors, by approximately $10.9 million to $26.3 million or, in percentage terms, between approximately 2 and 7 percent per month, and, consequently, also reported to investors and prospective investors a materially and falsely inflated NAV for year-end 2011 and year-end 2012.

63.     During the Relevant Period, Plaford knew or was reckless in not knowing that, as a result of the mismarking scheme, the Credit Fund reported to investors and prospective investors a materially and falsely inflated NAV at each month's end, and at year-end 2011 and year-end 2012.

64.     During the Relevant Period, as a result of the mismarking scheme, some investors bought their Credit Fund investments at an inflated NAV, and other investors redeemed their investments in the Credit Fund at an inflated NAV, thereby diluting the remaining Credit Fund investors' interests.

65.     During the Relevant Period, as a result of the mismarking scheme, the Credit Fund reported materially and falsely inflated performance and/or returns to investors and prospective investors.

66.     During the Relevant Period, Plaford knew or was reckless in not knowing that, as a result of the mismarking scheme, the Credit Fund reported materially and falsely inflated performance and/or returns to investors and prospective investors.

67.     But for the mismarking scheme, for 2011, the Credit Fund would have reported an annual loss of approximately 4 percent, instead of the 0.68 percent gain it reported to investors and prospective investors.

68.     But for the mismarking scheme, for 2012, the Credit Fund would have reported an annual gain of approximately 4 percent, instead of the 5.82 percent gain it reported to investors and prospective investors.

***Plaford Engaged in a Manipulative Trade to Inflate the Apparent Value of a Credit Fund Security.***

69.     On or about October 28, 2011, Plaford knowingly caused the Credit Fund to pay an above-market price for the CMED 4% Bond to inflate its apparent value and the apparent value of the Credit Fund's position in the CMED 4% Bond.

70.     On or about October 28, 2011, Plaford caused the Credit Fund to purchase approximately $760,000 worth of the CMED 4% Bond at a price of $71.50 per bond, just two days after, as Plaford knew, the fund had paid a price of $63.51 per bond for $585,000 worth of the same bonds.

71.     On or between October 26 and 28, 2011, according to TRACE, a bond-pricing service used by Investment Adviser and available to Plaford, the trade price for the CMED 4% Bond never exceeded a price of $64.00 per bond.

72.     As a result of Plaford's October 28, 2011 trade, Reuters increased its price for the CMED 4% Bond to $71.88 per bond, which the Credit Fund then used for the October 2011 month-end valuation of the position.

***Plaford Misclassified Distressed Assets in the Credit Fund as Having Observable Market Inputs for Valuation Purposes When They Did Not.***

73.     Plaford's and Lumiere's use of sham broker quotes repeatedly caused the Credit Fund's independent administrator to misclassify certain distressed assets held by the Credit Fund as having observable market inputs for the values at which they were marked when those assets did not have observable market inputs for the values at which they were marked.

74.     Monthly reports provided to Credit Fund investors by the fund's independent administrator disclosed the percentage of fund assets in each of three "fair value" classifications, as defined by ASC Topic 820.

75.     ASC Topic 820's framework for measuring fair value establishes a fair value hierarchy based on the quality of inputs used to value an asset or liability.  The inputs are categorized into three levels, corresponding to the nature of the inputs used in the valuation technique:  Level 1, the highest classification, is for assets or liabilities valued based on unadjusted quoted prices in active markets for identical assets or liabilities on the measurement date; Level 2 is for assets or liabilities that do not have quoted prices in active markets on the measurement date, but fair value can be calculated, directly or indirectly, based on observable market inputs; and Level 3 is for assets or liabilities that lack observable market inputs and, therefore, are valued based on management estimates or pricing models.

76.     To certain Credit Fund investors, the ASC Topic 820 classifications were important because they enabled the investors to assess the liquidity of the Credit Fund's portfolio, with a Level 1 classification indicating the most liquid assets, Level 2, somewhat liquid assets, and Level 3, illiquid assets.

77.     By fall 2012, both ATI and CMED had become distressed companies and, as a result, the trading in their debt, including the ATI Term Loan B and CMED 4% Bond, was thin and at prices that were far lower than Investment Adviser's valuations for these securities.

78.     The sham broker quotes Plaford and Lumiere U-turned through the friendly brokers to value the ATI Term Loan B and CMED 4% Bond falsely appeared to Investment Adviser's back office and the Credit Fund's independent administrator as observable market inputs for valuation purposes for those assets.

79.     Consequently, Investment Adviser classified the ATI Term Loan B and CMED 4% Bond as Level 2 assets, which relied on observable market inputs, and the Credit Fund's independent administrator reported them as Level 2 assets to Credit Fund investors in its monthly investor reports, instead of as Level 3 assets, which would have signaled to investors that the assets' values were derived not from observable market inputs and, therefore, the assets were less liquid.

80.     Investment Adviser did not classify any Credit Fund assets as Level 3 until December 2012, when the reported amount of the fund's Level 3 assets jumped from 0 to 8.97 percent, based primarily on a reclassification of the Credit Fund's CMED and ATI holdings from Level 2 to Level 3.

81.     But for Lumiere's and Plaford's use of sham broker quotes to value the ATI Term Loan B and CMED 4% Bond positions, months prior to December 2012, Investment Adviser would have had to mark down these assets to reflect their prevailing market values, or classify them as Level 3 assets, in which case the Credit Fund's independent administrator would have classified them as Level 3 assets in its monthly reports to Credit Fund investors.

*Plaford's Insider Trading Based on Material Nonpublic Information*

82.    Plaford also participated in an insider trading scheme.  On or between March 1, 2010 and July 23, 2010, Plaford profitably traded on behalf of the Credit Fund based on material nonpublic information he received concerning an impending approval by the FDA's OGD to permit the sale of enoxaparin, a generic version of Sanofi's brand-name drug Lovenox.

83.    Plaford received the material nonpublic information from Valvani, who, as Plaford knew, obtained the information from Johnston, a former OGD official who served as a paid consultant to Investment Adviser.  Johnston obtained the material nonpublic information from friends and former OGD colleagues who were still employed at OGD, including, in particular, an OGD official with whom Johnston had a close and personal relationship (the "FDA Official").

84.    Plaford knew that Johnston served in an important role within the Generic Drug Trade Association and that Johnston obtained information for Valvani by calling friends and former colleagues within the FDA.

85.    Johnston violated a duty of trust or confidence owed to the FDA Official, as well as a duty of trust or confidence Johnston owed to the Generic Drug Trade Association, under his employment agreement with the association, which required Johnston to keep information he learned in connection with the Generic Drug Trade Association or its members confidential and not use his role as the Generic Drug Trade Association's representative to the FDA for personal gain.

86.    At the time Johnston provided the material nonpublic information to Valvani concerning the impending enoxaparin approval, under his agreement with Investment Adviser, Investment Adviser paid Johnston $5,000 per month for his consulting services.

87.     Plaford knew that the information obtained by Johnston constituted material nonpublic information and knew, or was reckless in not knowing, that it had been obtained in breach of a duty.

88.     Following receipt of the material nonpublic information, Plaford caused the Credit Fund to purchase credit default swaps linked to Sanofi, betting that the company's revenues and creditworthiness would decline upon the FDA's approval of a generic drug that would compete directly with Sanofi's Lovenox.  As a result of these unlawful trades, the Credit Fund reaped illicit profits of approximately $26,000.

***Investment Adviser's Policies and Procedures Failed to Prevent Plaford's Misuse of Material Nonpublic Information.***

89.     Investment Adviser was required, pursuant to Section 204A of the Advisers Act, to establish, maintain, and enforce written policies and procedures, reasonably designed, taking into consideration the nature of Investment Adviser's business, to prevent the misuse of material, nonpublic information.

90.     Investment Adviser's written policies and procedures relating to the prevention of the misuse of material nonpublic information generally prohibited Investment Adviser's employees from trading on any material nonpublic information that they obtained in the course of their employment.

91.     During the relevant period, Investment Adviser's written policies and procedures to implement its prohibition on insider trading required employees to attend compliance training (held at least once a year) during which insider trading would be covered, and to contact Investment Adviser's Legal Department or CCO if they had received or had questions about whether the information they received was material nonpublic information.  Additionally, employees had to sign an acknowledgement that they had read and understood Investment

Adviser's written policies and, in or about 2011, an acknowledgement that, among other things, he or she was prohibited from trading on the basis of material nonpublic information.

92.     Investment Adviser's written policies and procedures listed numerous types of information that could constitute material nonpublic information and, when engaging a third party consultant, required that any engagement agreement include a prohibition against insider trading.

93.     Investment Adviser's procedures thus put the onus on employees to alert its Legal Department or CCO whenever there was a possibility that information they received was material nonpublic information and to forgo trading on the material nonpublic information.

94.     Aside from these measures, Investment Adviser had limited additional measures. Investment Adviser, for example, had no measures in place to monitor employees' communications with outside consultants, or to remind paid outside consultants not to share with Investment Adviser or its employees any actual or potential material nonpublic information.

95.     During 2010, after receiving the material nonpublic information concerning the FDA's impending enoxaparin announcement from Valvani, Plaford failed to alert Investment Adviser's Legal Department or CCO that Valvani had provided him with material nonpublic information he received from Johnston and, instead, caused the Credit Fund to place trades based on that material nonpublic information.

96.     Three years later, Plaford again received material nonpublic information concerning an impending announcement from a governmental agency.  On or between May 30, 2013 and June 27, 2013, Plaford obtained material nonpublic information from another paid consultant ("Political Consultant").

97.     On or about May 30, 2013, Political Consultant emailed Plaford that he was expecting CMS to propose a cut to Medicare reimbursement rates for certain home health services of between "3% and 3.5% -- but much closer to 3.5%."

98.     On or about May 31, 2013, Plaford caused Investment Adviser to enter into an advisory services agreement with Political Consultant's firm, agreeing to pay a $100,000 annual advisory fee.

99.     On or about June 13, 2013, Political Consultant emailed Plaford a research note updating his guidance, indicating CMS would propose a cut to the relevant reimbursement rates of between 3.25 and 3.5 percent.

100.    Political Consultant told Plaford that his information concerning CMS's impending announcement came from sources within CMS.

101.    On or about June 27, 2013, CMS announced a 3.5 percent cut to the relevant Medicare reimbursement rates.

102.    After receiving the material nonpublic information concerning the impending CMS announcement from Political Consultant, Plaford failed to implement Investment Adviser's policies concerning material nonpublic information.  Plaford never contacted Investment Adviser's CCO concerning the material nonpublic information he received from the Political Consultant, and, instead, arranged for the Credit Fund and Balanced Fund to make trades in the securities of two home health services providers he believed would be impacted by the CMS announcement:  Amedisys, Inc. ("AMED") and Gentiva Health Services, Inc. ("GTIV").

103.    Specifically, on or between May 30, 2013 (when Plaford first learned of the impending announcement from Political Consultant) and June 27, 2013 (when CMS made the announcement), based on the material nonpublic information he received from Political

Consultant, Plaford:  (a) increased the Balanced Fund's short position in AMED from 314,425 shares to 457,844 shares; (b) increased the Balanced Fund's short position in GTIV from 284,338 shares to 487,533 shares; (c) decreased the Credit Fund's short position in AMED from 389,466 shares to 357,247 shares, but caused the Credit Fund to purchase 2000 July put options on AMED, betting AMED's price would decline; and (d) decreased the Credit Fund's short position in GTIV from 470,962 shares to 285,667 shares, but caused the Credit Fund to purchase 2000 July put options on GTIV, betting GTIV's price would decline.

104.    As a result of these unlawful trades, the Credit Fund and Balanced Fund reaped, in the aggregate, illicit profits of approximately $285,000.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and (c) Thereunder
### (Mismarking Scheme)

105.    The Commission re-alleges and incorporates by reference paragraphs 1 through 104 of its Complaint.

106.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:  (1) has employed devices, schemes, or artifices to defraud; and/or (2) has engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

107.    As described above, Plaford knowingly or recklessly engaged in a fraudulent scheme to mismark securities held by the Credit Fund.

108.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and (c) Thereunder
### (Insider Trading Scheme)

109.    The Commission re-alleges and incorporates by reference paragraphs 1 through 104 of its Complaint.

110.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly: (1) has employed devices, schemes, or artifices to defraud; and/or (2) has engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

111.    As described above, Plaford knowingly or recklessly traded on material nonpublic information on behalf of funds managed by Investment Adviser.

112.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and (2) of the Advisers Act

113.    The Commission re-alleges and incorporates by reference paragraphs 1 through 104 of its Complaint.

114.    Defendant, directly or indirectly, while acting as an investment adviser, by use of the mails, and the means and instrumentalities of interstate commerce: (1) knowingly or recklessly has employed devices, schemes, or artifices to defraud clients or prospective clients; and/or (2) knowingly, recklessly, or negligently has engaged in transactions, practices, and

courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

115.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 206(4) of the Advisers Act
### and Rule 206(4)-8(a)(2) Thereunder

116.    The Commission re-alleges and incorporates by reference paragraphs 1 through 104 of its Complaint.

117.    Defendant, directly or indirectly, while acting as an investment adviser to a pooled investment vehicle, knowingly, recklessly, or negligently engaged in acts, practices or courses of business which were fraudulent, deceptive, or manipulative, with respect to an investor or prospective investor in the pooled investment vehicle.

118.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder.

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Section 204A of the Advisers Act

119.    The Commission re-alleges and incorporates by reference paragraphs 1 through 104 of its Complaint.

120.    Investment Adviser, while acting as an investment adviser, knowingly, recklessly, or negligently failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent

the misuse in violation of the Advisers Act [15 U.S.C. § 80b-1 et seq.] or the Exchange Act [15 U.S.C. § 78a et seq.], or the rules or regulations thereunder, of material, nonpublic information by such investment adviser or any person associated with such investment adviser.

121.    By reasons of the foregoing, Investment Adviser violated Section 204A of the Advisers Act [15 U.S.C. § 80 b-4a].

122.    Plaford, directly or indirectly, aided and abetted Investment Adviser's primary violations of Section 204A of the Advisers Act [15 U.S.C. § 80 b-4a] because he knowingly or recklessly provided substantial assistance to Investment Adviser's violation of Section 204A of the Advisers Act [15 U.S.C. § 80 b-4a].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests the Court enter a Final Judgment:

(a)    Finding that Defendant violated the securities laws alleged herein;

(b)    Permanently restraining and enjoining Defendant from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder; Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80-b6(2), and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder; and Section 204A of the Advisers Act [15 U.S.C. § 80b-4a];

(c)    Ordering Defendant to disgorge all ill-gotten gains received as a result of his violations of the federal securities laws and to pay prejudgment interest thereon;

(d)    Ordering Defendant to pay civil money penalties pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

(e)     Granting such other and further relief to the Commission as this Court may deem just and proper.

Dated:   June 15, 2016
         New York, New York

                              By:    _Sanjay Wadhwa_____
                                     Andrew M. Calamari
                                     Sanjay Wadhwa
                                     Charles D. Riely
                                     Valerie A. Szczepanik
                                     Alexander M. Vasilescu
                                     William T. Conway III
                                     Philip Moustakis
                                     Jason Sunshine
                                     Attorneys for Plaintiff
                                     SECURITIES AND EXCHANGE COMMISSION
                                     New York Regional Office
                                     Brookfield Place
                                     200 Vesey Street, Suite 400
                                     New York, New York 10281-1022
                                     (212) 336-0542 (Moustakis)